**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

SECURITIES AND EXCHANGE COMMISSION,

                    Plaintiff,                         CASE NO. 02-60082

v.                                                     HON. MARIANNE O. BATTANI

PATRICK D. QUINLAN, LEE P. WELLS, KEITH D.
PIETILA, ALEXANDER J. AJEMIAN, JOHN P.
O'LEARY, CHERL A. SWAIN, and KEVIN C.
LASKY,

                    Defendants.
_____/


**OPINION AND ORDER GRANTING PLAINTIFF'S MOTION FOR**
**SUMMARY JUDGMENT AS TO DEFENDANT PATRICK D. QUINLAN**

        Before the Court is Plaintiff Securities and Exchange Commission's Motion for

Summary Judgment as to Defendant Patrick D. Quinlan (Doc. No. 91).  The Securities and

Exchange Commission ("SEC") moves for summary judgment on its claims that Quinlan

violated the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77q(a), and the Securities

Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), from 1994 through 1999, when

Quinlan engaged in large scale securities offerings and accounting fraud.  The Court has

reviewed all the relevant pleadings[1] and finds oral argument will not aid in the resolution of

these motions.  See E.D. Mich. LR 7.1(2)(2).  For the reasons that follow, the Court

**GRANTS** Plaintiff's Motion for Summary Judgment.

---

        [1]Defendant has continued to file "additions" to his responsive pleading.  The
additions, which have been filed without leave of the Court, play no role in the disposition of
this motion.

## I. FACTS

Mortgage Corporation of America Financial Corporation ("MCA") was a high-risk mortgage banking business. (Compl. ¶ 26). During the period from the company's inception to January 1999, Defendant Patrick D. Quinlan worked as MCA's Chief Executive Officer and Chairman at MCA's corporate offices in Troy and Southfield, Michigan. (Compl. ¶ 14). Quinlan owned approximately 20% of MCA's common stock, and he was responsible for significant financial decisions for the MCA enterprise. (Id.).

MCA was involved primarily in the residential mortgage-banking business, acting as the mortgagee that lent funds to borrowers to purchase homes. (Compl. ¶ 26). A significant number of MCA's mortgages were "non-confirming," such that the home buyers generally posed a higher credit risk than average home buyers. (Id.). MCA typically obtained the funds to lend to home buyers from short-term lines of credit provided by a number of major banks. (Compl. ¶ 27). When the mortgages were sold in a secondary market, MCA would repay the lenders the borrowed funds. (Id.).

MCA sold the mortgages in at least two ways--to other mortgage bankers, and to investors in the form of ownership interests in pools of packaged mortgages known as pass-through certificates. (Compl. ¶¶ 28, 30). Investors were to receive on a quarterly basis the amounts received by MCA proportional to their ownership interests minus the expense MCA was permitted to deduct. (Id.). Thus, the values of these ownership interests were based on future interest and principal payments by the borrowers of the pooled mortgages. (Id.). Information regarding the creditor risks of the mortgages in the pool and the value of the corresponding real estate collateral was therefore important to potential investors. (Id.).

From 1994 through 1999, MCA sponsored and sold approximately 73 series of pass-through certificates with assets totaling approximately $71 million. (Compl. ¶ 29). In

addition, MCA sold approximately $19 million of corporate debentures to raise working capital for its mortgage banking operations. (Compl. ¶ 31). MCA registered the debentures under section 5 of the Securities Act and filed periodic reports containing financial statements under section 15(d) of the Exchange Act. (Id.).

Beginning in 1994, Defendant was aware that MCA was in financial trouble due to the plummeting margins in MCA's mortgage banking business. (Compl. ¶ 32). Quinlan advanced a scheme to other MCA executives. According to a memo he authored, (Pl.'s Ex. 2), to inflate income and equity and enhance cash flow, real estate purchased by MCA for $17,4000, could be sold to partnerships owned and controlled by Quinlan and another MCA executive at an artificially inflated price of $40,000, allowing MCA to recognize a gross gain on sale of real estate in its income statement of $22,600. MCA would then advance the related limited partnerships a 20% down payment or $8,000 and receive a mortgage of $32,000 from the related limited partnerships. That mortgage could be included in a pool of mortgages sold to investors through the pass-through certificates or included as an asset under the category of "Mortgages Held for Resale" on the balance sheet. (Id.). The related limited partnerships could not repay the mortgages or the down payments advanced by MCA because they had paid an artificially inflated price for the real estate.

MCA's annual report, released in 1995, reports a net loss of $277,546. (Compl. ¶ 32). From May 1994 to May 1995, MCA was "in deep red ink for the first time ever and there were no quick answers to turn things around." (Compl. ¶ 34). MCA lost millions in fiscal years 1996 and 1997 in its mortgage banking business. (Compl. ¶ 35). On January 22, 1999, mortgage bankers stopped lending money to the company, which led to its demise. Thereafter, the bankruptcy court liquidated MCA's assets. As a result, MCA's lenders and investors lost in excess of $256 million, of which the investing public lost at least $68 million

on mortgage pass-through certificates and debenture investors lost all of the approximately $19 million invested.  (Compl.  ¶¶ 2, 3; Pl.'s Ex. 24).

## II.  PROCEDURAL HISTORY

On April 24, 2002, the SEC commenced the instant action against Quinlan, as well as Lee P. Wells, Keith D. Pietila, Alexander J. Ajemian, John P. O'Leary, Cheryl A. Swain, and Kevin C. Lasky.  The SEC accused these Defendants of various violations of the federal securities laws prohibiting securities fraud and misrepresentation.  On February 5, 2003, the United States Attorney's Office for the Eastern District of Michigan moved to intervene and stay discovery.  It asserted that discovery in this matter would result "in the disclosure of sensitive information critical to the anticipated trial" in a related federal criminal action against Defendants then pending before the Honorable Nancy G. Edmunds.  Case No. 01-CR-80514.  On April 22, 2003, this Court granted the motion to stay pending the resolution of the criminal case.

On February 3, 2004, Quinlan signed a guilty plea in the related criminal case on false statement and conspiracy charges, which was accepted on February 24, 2004.[2] (Pl.'s Ex. 3).  In the agreement, Quinlan pled guilty to conspiring to obtain funds from investors by means of false and fraudulent pretenses, representations, and promises and making false statements to the SEC.  The plea agreement provides that Quinlan knew about and approved of the false representations and that MCA misrepresented the rate of return and risk of the pass through certificates that were sold from 1994 through 1999.

_____

[2]Defendant subsequently had a change of heart and moved to withdraw his guilty plea, but the motion was denied on May 11, 2005.  U.S. v. Quinlan, No. 01-CR-08514 (E.D. Mich. May 11, 2005).

(Pl.'s Ex. 3, pp. 3-4).  It also noted that Quinlan participated in and presided over the committee that made all significant financial decisions for MCA, including the decision to deliberately engage in fraudulent business and accounting practices.  (Id., pp. 6-7).  The plea agreement included an admission that investors relied on MCA's financial statements that represented MCA's financial condition to be better than it was.  (Id., pp. 3-4).  In addition, the plea agreement provided that MCA's true financial condition was materially worse than it was represented to be in quarterly and annual reports, and registration statements.  Those reports and statements included materially false statements and omitted material facts about MCA's assets, liability and revenues.  (Id., p. 6).  According to the plea agreement, Quinlan signed MCA's 1998 annual report on Form 10-K on April 29, 2998, knowing it contained materially false statements and concealed material facts relative to the fiscal year ending January 31, 1998.  (Id.).  The annual report overstated that value of mortgages held for resale, omitted MCA's liability to the pass-through certificate investors, and overstated MCA's revenues from the sale of real estate to the related limited partnerships.  (Id.).

On August 4, 2005, Quinlan was convicted of conspiracy and making false statements and was sentenced to 120 months imprisonment and restitution in the amount of $256 million to MCA's investors and lenders.  The decision was affirmed on January 5, 2007, by the Sixth Circuit.  See U.S. v. Quinlan, 473 F.3d 273 (6th Cir. 2007), cert. denied, 128 S.Ct. 251 (2007).

In the meantime, Quinlan also pled guilty in state court to one count of conspiracy to commit securities fraud and three counts of violating the state antifraud securities provisions.  (Pl.'s Ex. 7).  People v. Quinlan, No. 04-196515-FH (Mich. Ct. App. 2005).

The state criminal complaint alleged that from July 28, 1998, through January 19, 1999, Quinlan omitted material facts necessary to make statements made in connection with the offer and sale of pass-through certificates not misleading. (Pl.'s Ex. 8, p.2). In Count 1, Quinlan was charged with failure to advise investors of the actual rate of return on the pass-through certificates. (Id.). The other three counts differ in that individual investors were named. (Id., pp. 2-4). On April 19, 2005, the state court sentenced Quinlan to one year in prison to run concurrently with his federal sentence and ordered $83 million in restitution.

By February 28, 2006, all seven defendants in the criminal case had pled guilty and had been sentenced. The SEC subsequently moved to lift the stay of the civil case. After telephone hearings, the stay was lifted on January 10, 2007, to permit the SEC to proceed with its civil case. Thereafter, the SEC voluntarily dismissed its action for civil penalties against Defendant, and pursued only equitable relief, specifically a permanent injunction enjoining Quinlan from violating the federal security laws and rules promulgated thereunder as well as an officer and director bar.

On April 28, 2008, the SEC filed this Motion for Summary Judgment against Quinlan. The SEC relies on the doctrine of collateral estoppel to prevent Quinlan from relitigating his liability for securities violations because the relevant elements are established through the guilty pleas in the related criminal actions. It also relies on Quinlan's signature on MCA's registration statements on Form S-1 (Pl.'s Ex. 20-23), annual reports on Form 10-K (Pl.'s Exs. 9-10), quarterly reports on Form 10-Q (Pl.'s Exs. 11-19), as well as bankruptcy filings (Pl.s' Ex. 24), and a letter to MCA's auditors in connection with the 1998 annual audit (Pl.'s Ex. 25). The SEC asserts that this Court should grant summary judgment on all counts because there are no genuine issues of material facts regarding Quinlan's alleged failure to comply with securities regulations. Finally, the SEC requests a permanent injunction against

Quinlan, ordering him to comport with the requirements of both Acts, and also seeks an officer and director bar.

## III.  STANDARD OF REVIEW

Summary judgment is appropriate when "the judgment sought should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  "[S]ummary judgment will not lie if the dispute is about a material fact that is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the non-moving party."  Anderson v. Liberty Lobby Inc., 477 U.S. 242, 248 (1986); see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

The movant has the burden of establishing that there are no genuine issues of material fact, which may be accomplished by demonstrating that the nonmoving party lacks evidence to support an essential element of its case.  Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  Once the moving party carries that burden, the burden then shifts to the nonmoving party to present "significant probative evidence" to show that "there is [more than] some metaphysical doubt as to the material fact."  Moore v. Philip Morris Cos., 8 F.3d 335, 339-40 (6th Cir. 1993); Fed. R. Civ. P. 56(e).  The court will view the evidence in a light most favorable to the nonmovant.  See Hunt v. Cromartie, 526 U.S. 541, 549 (1999); Sagan v. U.S. 342 F.3d 493, 497 (6th Cir. 2003).  But the evidence must be more than the nonmovant's own pleadings and affidavits.  Smith v. Campbell, 250 F.3d 1032, 1036 (6th Cir. 2001).  The mere existence of a scintilla of evidence in support of the nonmovant is not sufficient.  Anderson, 477 U.S. at 252.

## IV.  ANALYSIS

## A.  Federal Securities Laws Violations

### 1.  Collateral Estoppel

The SEC uses the doctrine of collateral estoppel as a means to prevent Quinlan from relitigating civil liabilities arising out of his violations of the Securities Act and the Exchange Act, for the reason that the issues have been decided in related criminal proceedings. Collateral estoppel  bars "successive litigation of an issue of fact or law actually litigated and resolved in a valid court determination essential to the prior judgment, even if the issue recurs in the context of a different claim."  Taylor v. Sturgell, ___ U.S. ___, 128 S. Ct. 2161, 2170 (2008) (quoting New Hampshire v. Maine, 532 U.S. 742, 748 (2001)).  The doctrine of collateral estoppel "preclude[s] parties from contesting matters that they have had a full and fair opportunity to litigate, protects their adversaries from the expense and vexation attending multiple lawsuits, conserves judicial resources, and fosters reliance on judicial action by minimizing the possibility of inconsistent decisions."  Taylor, 128 S. Ct. at 2171 (quoting Montana v. U.S., 440 U.S. 147, 153-154 (1979)).  The law is clear that "a prior criminal conviction may work an estoppel in favor of the Government in a subsequent civil proceeding."  Emich Motors Corp. v. General Motors Corp., 340 U.S. 558, 568 (1951); U.S. v. Beatty, 245 F.3d 617 (6th Cir. 1978).  Courts have entered summary judgment in favor of the SEC against defendants based on the collateral estoppel effects of defendants' previous criminal convictions.  See e.g., SEC v. Blackwell, 477 F. Supp. 2d 891 (S.D. Ohio 2007) (guilt determination in parallel criminal action estopped the defendant from rearguing insider trading issues); SEC v. Opulentica LLC,, 479 F. Supp. 2d 319 (S.D. N.Y. 2007) (doctrine applies even in the absence of identical causes of action); accord SEC v. Haligiannis, 470 F. Supp. 2d 373 (S.D. N.Y. 2007); State Farm Fire & Cas. Co. v. Jenkins, 382 N.W.2d 796,

798-99 (Mich. App. Ct. 1985) (applying Michigan law).

The Sixth Circuit has held that a prior decision has preclusive effect on an issue raised in a later case if four elements are met:

> (1) the precise issue raised in the present case must have been raised and actually litigated in the prior proceeding; (2) determination of the issue must have been necessary to the outcome of the prior proceeding; (3) the prior proceeding must have resulted in a final judgment on the merits; and (4) the party against whom estoppel is sought must have had a full and fair opportunity to litigate the issue in the prior proceeding.

Smith v. SEC, 129 F.3d 356, 362 (6th Cir. 1997) (quoting Detroit Police Officers Ass'n v. Young, 824 F.2d 512, 515 (6th Cir. 1987)).

Quinlan thoroughly litigated the criminal charges and entered into the plea agreements. Specifically, of the twenty counts contained in the federal indictment, Defendant voluntarily pled guilty to Count 1 (conspiracy with others to commit mail, wire, and bank fraud and to make false statements in a manner within the jurisdiction of a federal agency, under 18 U.S.C. § 371) and Count 16 (false and fraudulent statements in an annual report Form 10-K filed with the SEC, a federal executive agency, under 18 U.S.C. § 1001). The court entered judgment against him on August 4, 2005. Although Quinlan did not plead guilty to securities law violations, there is a commonality of factual issues in the causes of action to which he pleaded guilty and the claims advanced here. Defendant's misrepresentation and securities fraud were essential to his criminal conviction, and the same conducts also constitute the basis for the instant civil action. This is all that is necessary. SEC v. Pace, 173 F.Supp.2d 30, 30-33 (D. D.C. 2001) (granting summary judgment on securities claims based on the defendant's conviction for wire fraud and tax fraud because the conviction precludes existence of factual issues relative to scienter); SEC

v. Dimensional Entertainment Corp., 493 F. Supp. 1270, 1273 (S.D. N.Y. 1980) (granting summary judgment on civil securities claims despite the defendant's acquittal of securities fraud based on his conviction for wire fraud).

The Court's determination is not impacted by Quinlan's motion to withdraw his guilty plea in his federal criminal proceeding. His request does not affect the application of collateral estoppel. See U.S. v. Szilvagyi, 398 F. Supp. 2d 842, 845-46 (E.D. Mich. 2005). The judgment of the federal criminal case has been affirmed by the Sixth Circuit. Quinlan's assertion that no final judgment has been rendered because he has filed a habeas corpus petition does not alter the analysis. Notwithstanding Quinlan's pending petition for habeas corpus relief, he has had a full and fair opportunity to litigate the issues presented at his criminal trial to a final judgment. See Smith v. SEC, 129 F.3d 356, 362 n.7 (6th Cir. 1997) (observing that a direct appeal does not deprive a conviction of hits preclusive effect for purposes of the doctrine); Ashe v. Swenson, 397 U.S. 436, 443 (1970) (applying collateral estoppel to criminal case and explaining that "when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit"). Consequently, the Court finds that the application of collateral estoppel is warranted, and Quinlan may not relitigate MCA's fraudulent conduct, his knowledge thereof, or his participation in the fraudulent conduct.

### 2. Substantive Violations

The SEC alleges that from at least 1994 through 1999, Defendants engaged in a large scale securities offering and accounting fraud at MCA. The SEC further alleges that the Defendant's conduct violated and aided and abetted violations of the federal securities laws as a result of his participation in MCA's scheme to defraud investors in MCA's real

10

estate pass-through certificates and corporate debentures.

### a. Violations of the Antifraud Provisions of the Securities Act and the Exchange Act (Counts I, II, and III)

Section 17(a) of the Securities Act,[3] Section 10(b) of the Exchange Act,[4] and Rule

10b-5[5] prohibit manipulative and deceptive practices, or the making of untrue statements of

---

[3]Section 17(a) of the Securities Act of 1933 makes it unlawful for any person, directly or indirectly in the offer or sale of any securities:

> (1) to employ any device, scheme, or artifice to defraud, or
> (2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or
> (3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

15 U.S.C. § 77q(a).

[4]Section 10(b) of the Exchange Act of 1934 makes it unlawful for any person, directly or indirectly:

> (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, or any securities-based swap agreement ..., any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b).

[5]Rule 10b-5 makes it unlawful for any person, directly or indirectly
> (a) To employ any device, scheme, or artifice to defraud,
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

material facts or omitting to state material facts, in the offer or sale, or in connection with the purchase or sale, of any security. 15 U.S.C. § 77q(a); 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5. To establish violations of Section 17(a)(1) of the Securities Act, Section 10(b) of the Exchange Act, and Rule 10b-5, the SEC must show, by a preponderance of the evidence, that the defendant "engaged in (1) misrepresentations or omission of material facts; (2) made in connection with the offer, sale or purchase of securities; (3) with scienter on the part of the defendant[ ]." SEC v. George, 426 F.3d 786, 792 (6th Cir. 2005) (citing Ernst & Ernst v. Hochfelder, 425 U.S. 185 (1976)).

A fact is material when "a substantial likelihood exists that (1) a reasonable shareholder would consider the fact important in making his investment decision, and (2) a reasonable shareholder would view the information as having significantly altered the total mix of information." George, 426 F.3d at 792 (quoting Basic, Inc. v. Levinson, 485 U.S. 224, 231-32 (1988)). "Scienter may be established by proof of recklessness—'highly unreasonable conduct which is an extreme departure from the standards of ordinary care.'" George, 426 F.3d at 792 (quoting Mansbach v. Prescott, Ball & Turben, 598 F.2d 1017, 1025 (6th Cir. 1979)).

The Court agrees with Plaintiff that Defendant's guilty pleas and criminal convictions offer undisputed evidence of Quinlan's knowledge of and participation in the fraud directed at MCA's investors and the misrepresentation with regard to the debenture registration statements and annual and quarterly reports. His Rule 11 Plea Agreement provides that he "knowingly participated in and assisted in the execution of this scheme to defraud investors, lenders, and others by attending, participating in, and presiding over meetings of MCA's Financial Management Committee. The Committee made all significant financial decisions for the MCA enterprise, including decisions to deliberately engage in business and

12

accounting practices that were fraudulent, as all five members of the committee well knew."
(Def.'s Rule 11 Plea Agreement 6-7).  Finally, his misrepresentations were in connection
with the offer of sale of securities.  They were made in the debenture registration statements
and pass-through certificate prospectuses, which were drafted to provide information for
potential investor reliance in making investment decisions.  This is a sufficient basis for a
violation.  See e.g. SEC v. Pena Research, Inc., 8 F.3d 1358, 1362 (9th Cir. 1993) ("where
fraud alleged involves public dissemination such as a press release, annual report,
investment prospectus or other such document on which an investor would presumably rely,
the 'in connection with' requirement is met" by proof of dissemination and of materiality of
misrepresentations or omissions).

In light of his participation in and approval of MCA's pass-through certificates
from 1994 through 1999, Quinlan is primarily liable for the misrepresentations of material
facts to investors with regard to the risk and rate of return in the pass-through certificates.
Quinlan also is liable for misrepresenting MCA's true financial situation given his
signature on registration statements and annual and quarterly reports in connection with
the sale of corporate debentures from 1996 to 1998.   See In re Scholastic Corp. Sec.
Litig, 252 F.3d 63, 75-76 (2d Cir. 2001) (holding that the company officer may be
primarily liable for misleading statements where he was involved in drafting, reviewing,
and disseminating the statements);  In re Initial Public Offering Securities Litigation, 241
F.Supp.2d 282, 363 (S.D. N.Y. 2003) (persons who signed registration statements can
be held primarily liable for untrue statements of material facts therein).  In sum, the
elements of the cause of action are established as a matter of law.

### b.  Aiding and Abetting Violations of the Reporting Provisions

of                    **the Exchange Act (Count V)**

Section 15(d) and Rules 15d-1 and 15d-13 require issuers that have filed

registration statements with the SEC to file annual and quarterly reports.  15 U.S.C.

§78o(d); 17 C.F.R. §§ 240.15d-1, 240.15d-13.  The reporting provisions of the Exchange

Act require the filing of complete, accurate and timely reports.  SEC v. Savoy Indus., Inc.,

587 F.2d 1149, 1165 (1978) (quoting SEC v. IMC Int'l, Inc., 384 F. Supp. 889, 893 (N.D.

Tex. 1974)).  Furthermore, Rule 12b-20 demands that material information be furnished

where necessary to make these periodic reports not misleading.  17 C.F.R. § 240.12b-

20.

The Sixth Circuit articulated the standard for aiding and abetting violations of the

Exchange Act as follows:

> [A] person may be held as an aider and abettor only if some
> other party has committed a securities law violation, if the
> accused party had general awareness that his role was part of
> an overall activity that is improper, and if the accused aider-
> abettor knowingly and substantially assisted the violation.

SEC v. Washington County Util. Dist., 676 F.2d 218, 224 (6th Cir. 1982) (quoting SEC v.

Coffey, 493 F.2d 1304, 1316 (6th Cir. 1974)).  Moreover, "the defendant must have

knowledge of the wrongful character of the activity, not merely knowledge of the activity

which led to the wrong."  SEC v. Orr, No. 04-74702, 2006 WL 542986 at *11 (E.D. Mich.

Mar. 11, 2006) (quoting Vidosh v. Holsapple, 1987 WL 273164 at *17 (E.D. Mich. Feb. 2,

1987)).

It is undisputed that MCA violated the Exchange Act by filing materially false

statements and omitting material facts in its annual and quarterly reports from at least

1996 through 1998.  On or about April 29, 1998, during and in furtherance of the

conspiracy, Quinlan signed SEC Form 10-K (annual report) for the fiscal year ending

January 31, 1998, in his capacity as Principal Executive Officer and Chairman of MCA

Financial Corp. He knew that the 10-K contained materially false and fraudulent

statements and concealed material facts. (Def.'s Rule 11 Plea Agreement 6-7). He

signed annual and quarterly reports. Morever, it is undisputed that Quinlan participated

in and presided over the MCA committee that made all significant financial decision,

including the decision to engage in fraudulent business and accounting practices.

Accordingly, the Court finds that Quinlan aided and abetted MCA's violations of the

reporting provisions of the Exchange Act. SEC v. Yuen, No. 03-4376, 2006 WL 1390828

at * 41-2 ( C.D. Cal. March 16, 2006).

### c. Primary Violations and Aiding and Abetting Violations of the Books and Records and Internal Control Provisions of the Exchange Act (Counts VI, VII, IX)

Section 13(b)(5) of the Exchange Act prohibits any person from knowingly

circumventing or knowingly failing to implement a system of internal controls, and from

knowingly falsifying or causing to be falsified any book, record, or account required under

Section 13(b)(2)(A) and (B) of the Exchange Act. 15 U.S.C. §78m(b)(5). Rule 13b2-1

promulgated under the Exchange Act prohibits any person from, directly or indirectly,

falsifying or causing to be falsified any book, record, or account required to be kept

pursuant to the Exchange Act. 17 C.F.R. § 240.13b2-1.

With regard to the aiding and abetting claims, Section 13(b)(2)(A) of the Exchange

Act requires reporting companies to make and keep books, records, and accounts that in

reasonable detail accurately and fairly reflect the transactions and dispositions of the assets

of the company. 15 U.S.C. §78m(b)(2)(A). Section 13(b)(2)(B) of the Exchange Act requires

reporting companies to devise and maintain a system of internal accounting controls that provide reasonable assurance that transactions are recorded as necessary (1) to permit the preparation of financial statements in conformity with generally accepted accounting principles ("GAAP"); and (2) to maintain accountability for assets. 15 U.S.C. § 78m(b)(2)(B). These provisions are violated even in the absence of proof of scienter and materiality. <u>SEC v. World-Wide Coin</u>, 567 F. Supp. 724, 729 (D.C. Ga. 1983).

Here, Defendant's criminal conviction demonstrates that he knew of and substantially assisted MCA's violations in participating and presiding over the MCA committee which made all significant decisions, including the decision to engage in fraudulent accounting practices. Moreover, Quinlan signed MCA's false 1998 representation letters to auditors. (Pl.'s Ex. 25). Further MCA maintained books and records that did not accurately and fairly reflect the transactions and disposition of MCA's assets. Nor did MCA maintain a system of internal accounting controls that provided reasonable assurance that transactions were recorded as necessary to permit the preparation of accurate financial statements in conformity with GAAP and maintain the accountability for assets. The Court therefore finds that Quinlan violated, and aided and abetted MCA's violations of the internal control provisions of the Exchange Act.

### d.  Violations of Rule 13b2-2 under the Exchange Act (Count VIII)

Rule 13b2-2, promulgated under the Exchange Act, prohibits directors and officers of an issuer from, either directly or indirectly, making materially false and misleading statements or omitting to state material facts to an accountant in connection with (1) "any audit or examination of the financial statements of the issuer;" or (2) "the preparation or filing of any document or report required to be filed" with the SEC pursuant to the Exchange Act.

16

17 C.F.R. § 240.13b2-2.  The Court finds that Quinlan violated the Rule when he signed the letter to the auditors in 1998 regarding MCA's annual audit.  He represented that all material transactions had been properly recorded in the accounting records underlying the financial statements for the fiscal years ending January 31, 1998, and January 31, 1997.   Again Quinlan is estopped from claiming that he did not know that material transactions had not been properly recorded because he participated in an presided over the MCA committee that made the decision to engage in fraudulent business and accounting practices in the relevant time frame and he knew that the statements contained material misrepresentations and omissions.

### B. Permanent Injunction and Officer and Director Bar

The SEC requests that the Court issue a final judgment imposing a permanent injunction against violating the federal securities laws or any rules promulgated by the SEC under the authority of the securities laws.  The SEC also petitioned the Court for an officer and director bar against Defendant.

Section 20(b) of the Securities Act and Section 21(d)(1) of the Exchange Act allow the SEC to obtain permanent injunctive relief.  15 U.S.C. §77t(b); 15 U.S.C. §78u(d)(1).  To determine the necessity of such relief, courts focus on whether there is a reasonable and substantial likelihood that the defendant will engage in securities violations in the future.  SEC v. Youmans, 729 F.2d 413, 415 (6th Cir. 1984).  The Sixth Circuit has adopted a seven-factor test for such determinations:

> (1) the egregiousness of the violations; (2) the isolated or repeated nature of the violations; (3) the degree of scienter involved; (4) the sincerity of the defendant's assurances, if any, against future violations; (5) the defendant's recognition of the wrongful nature of his conduct; (6) the likelihood that the defendant's occupation will present opportunities (or lack thereof) for future violations, and (7) the defendant's age and health.

Youmans, 729 F.2d at 415; see also Washington County Util. Dist., 676 F.2d at 227 n.19.

No one factor in and of itself is dispositive.  Washington County Util. Dist., 676 F.2d at 227

n.19.  A past record of securities violations usually serves as an inference for the likelihood

of future violations.  Id.  The inference becomes stronger as the frequency and magnitude of

the past violations increase.  Id.

At the time Quinlan engaged in violations of the securities law, Section 20(e) of the

Securities Act and Section 21(d)(2) of the Exchange Act permitted a court to prohibit a

person who violated Section 17(a)(1) of the Securities Act or Section 10(b) of the Exchange

Act from acting as an officer or director of a public company, provided the person's conduct

demonstrates substantial unfitness to serve as an officer or director.  15 U.S.C. §§ 77t(e),

78u(d)(2).  In assessing the degree of the defendant's substantial unfitness, courts have

reviewed:

> (1) the egregiousness of the underlying securities law violation;
> (2) the defendant's repeat offender status; (3) the defendant's
> role or position when he engaged in the fraud; (4) the defendant's
> degree of scienter; (5) the defendant's economic stake in the
> violation; and (6) the likelihood that misconduct will recur.

SEC. v. Patel, 61 F.3d 137, 141 (2d Cir. 1995); see also SEC v. First Pacific Bancorp,

142 F.3d 1186, 1193 (9th Cir. 1998).  A court need not find all of the factors are

satisfied; it retains substantial discretion in determining whether to impose the bar.

SEC v. Posner, 16 F.3d 520, 521 (2d Cir. 1994).

The Court finds that injunctive relief and a permanent officer and director bar should

be imposed against Defendant. First and foremost, the evidence shows that Quinlan knowingly and deliberately engaged in fraudulent business and accounting practices for an extended period of time from 1994 through 1999. In his capacity as CEO of MCA, Quinlan repeatedly made false financial statements and misrepresented material facts with the intention to mislead investors, causing investors to lose millions of dollars. He lied to the auditors. Quinlan's conduct certainly was egregious. At his sentencing, the trial court characterized Quinlan as the "dominant force" and the "architect" of the scheme. (Pl.'s Ex. 26, p. 2). Moreover, the Court is not persuaded that Defendant recognizes the wrongful nature of his conduct, in light of his repeated denials of any wrongdoing in the downfall of MCA, his lack of remorse for the tremendous loss suffered by the investors, and his attempt to withdraw his guilty plea. (Id., p. 39). He benefitted from his conduct; he "lived a very good life for a very long time based on proceeds generated by [the] offense." (Id., p. 40). Should Quinlan retain access to the same occupation upon his scheduled release from prison, the Court cannot disregard the reasonable and substantial likelihood that he will engage in future violations of the federal securities laws at the public's risk and expense. (See id. P. 40, recognizing the likelihood that the public is likely to suffer addition danger from Quinlan).

Before ordering such relief, the Court considers Defendant's assertion that the statute of limitations bars entry of an injunction against him. At the outset, the Court observes that in SEC v. Rind, 991 F.2d 1486, 1490 (9th Cir. 1993), the Ninth Circuit reasoned that the SEC is not subject to limitation periods because its duty to vindicate a public right or interest and to safeguard that interest through injunctive relief would be hampered. Id. at 1491. "State limitation periods do not bind the United States when it sues to vindicate a public right or interest absent a clear showing of congressional intent to the contrary." Id. This reasoning has been embraced by other courts, particularly in light of the fact that the federal securities

statute contains no explicit waiver of sovereign immunity, and the SEC is a public agency receiving public funds. Consequently, a "presumption of waiver would undermine the public fisc." <u>SEC v. Harden</u>, No. 05-354, 2006 WL 89864 at *1 (W.D. Mich. Jan. 12, 2006). Further, the rationale is consistent with the general rule of federal law that waiver of sovereign immunity is narrowly construed. <u>Id.</u> (citing <u>U.S. v. Summerlin</u>, 310 U.S. 414, 416 (1940)); <u>see also</u> <u>Hatchett v. U.S.</u>, 330 F.3d 875, 887 (6th Cir. 2003).

Notwithstanding the reasoning advanced in <u>Rind</u>, Defendant asserts that, to the extent the SEC's claims seek to impose a civil penalty, they are subject to a statute of limitations, and 28 U.S.C. § 2462 applies. <u>SEC v. Jones</u>, 476 F. Supp. 2d 374 (S.D. N.Y. 2007). Section 2462 explicitly applies to all actions unless Congress provides otherwise. It reads:

> Except as otherwise provided by Act of Congress, an action, suit or proceeding for the enforcement of any civil fine, penalty, or forfeiture, pecuniary or otherwise, shall not be entertained unless commenced within five years from the date when the claim first accrued if, within the same period, the offender or the property is found within the United States in order that proper service may be made thereon.

28 U.S.C. § 2462.

Quinlan's position is not necessarily contrary to <u>Rind</u>, which did not consider the applicability of § 2462 in the context of civil penalties. The fact that § 2462 applies to SEC actions seeking civil penalties may not aid Defendant's position; courts have held that suits filed by the SEC for equitable relief "are not governed by § 2462 because they are not actions or proceedings for a 'penalty' within the meaning of the statute." <u>SEC v. Tandem Mgmt. Inc.</u>, No. 95-8411, 2001 WL 1488218 n.6 (S.D. N.Y. Nov. 21, 2001). <u>Accord</u> <u>Mullikin v. United States</u>, 952 F.2d 920, 928 (6th Cir. 1991) (reaching a similar conclusion when analyzing Section 2462 in the context of actions to collect penalties under Section 6701 of

the Internal Revenue Code, and noting that it could be implied that Congress, while not expressly addressing the issue, did not intend a period of limitations to apply). Accordingly, the dispositive issue is how to characterize the suit at hand.

Courts have defined the term "penalty" for purposes of § 2462 as "a form of punishment imposed by the government for unlawful or proscribed conduct, which goes beyond remedying the damage caused to the harmed parties by the defendant's action." See, e.g., Johnson v. SEC, 87 F.3d 484, 486-92 (D.C. Cir. 1996). The Johnson Court distinguished a remedial measure from a punitive measure in that a remedial measure restores the wronged party to its *status quo ante*, whereas a sanction for purposes of punishment is not for such corrective effects. Id. at 491. See also U.S. v. Telluride, 146 F.3d 1241 (10th Cir. 1998). It nevertheless emphasized that the reason for the sanction is relevant. For example, it noted that the imposition of a six-month suspension is less penal in nature when it is based on the degree of risk posed to the public.

The Court is mindful that the punitive and the remedial measures are not always easily distinguishable, and the labeling may reflect a conclusion rather than a thoughtful analysis. Collins Sec. Corp. v. SEC, 562 F.2d 820, 825 (D.C. Cir. 1977). Without question, the equitable relief sought by the SEC may have a painful impact on Defendant, who is removed from his profession. That potential impact requires the Court to consider whether the equitable relief is requested as a penalty or as a remedial measure. If it serves primarily as a penalty, the limitations period under § 2462 arguably applies.[6] If, however, the equitable relief is aimed primarily at preventing future harm to the public rather than at

---

[6]Despite Defendant's assertion that this action is barred by the statute of limitations, the facts show that the complaint, which was filed in April 2002, is timely to the extent that Defendant engaged in unlawful conduct constituting violations of the Securities Act and the Exchange Act after April 1997.

punishing Quinlan, the Court should deem it a remedial measure, even though it does not restore the *status quo ante.* See Johnson, 87 F.3d at 488-89.

In rendering this assessment, the Court considers two major factors: (1) The degree and extent of the consequences to the subject of the sanction; and (2) the degree of risk the defendant poses to the public, that is, the likelihood of recurrence of violating security regulations. Jones, 476 F. Supp. 2d at 380-81; Johnson, 87 F.3d at 489. Whether a sanction is sufficiently punitive to constitute a "penalty" within the meaning of § 2462 is an objective assessment; it is not measured from the subjective perspective of the accused. Johnson, 87 F.3d at 488 (noting that making the determination from the defendant's perspective ensures it will be deemed a penalty because "even remedial sanctions carry the sting of punishment") (citation omitted).

The potential collateral consequences to Quinlan from a permanent injunction and officer and director bar are admittedly considerable, even from an objective point of view. The practical effect of such an injunction would work to stigmatize Defendant in the investment community. Moreover, the injunction would deprive him of any ability and opportunity to earn a living as an official or director throughout his life after his release from the prison. Because of the far-reaching consequences to Defendant that the bar poses, the Court carefully considers evidence demonstrating the likelihood of recurrence.

Here, the SEC must "go beyond the mere facts of past violations and demonstrate a realistic likelihood of recurrence." SEC v. Commonwealth Chem. Sec., Inc., 574 F.2d 90, 99 (2d Cir. 1978); see also SEC v. Culpepper, 270 F.2d 241, 250 (2d Cir. 1959) ("[T]he moving party must satisfy the court that relief is needed [and] that there exists some cognizable danger of recurrent violation. . . ."). In Commonwealth Chem., 574 F.2d at 100., the Second Circuit has looked to five factors in determining a defendant's likelihood to commit future

misconduct:

> (1) The fact that defendant has been found liable for illegal conduct, (2) the degree of scienter involved, (3) whether the infraction is an "isolated occurrence," (4) whether defendant continues to maintain that his past conduct was blameless, and (5) whether, because of his professional occupation, the defendant might be in a position where future violations could be anticipated.

Here, all five factors favor the SEC's position. First, Quinlan is guilty of conspiracy to commit fraud and to make false statements, and of making false and fraudulent statements in an annual report filed with the SEC. <u>Quinlan</u>, No. 01-CR-08514 (E.D. Mich. May 11, 2005). Second, Defendant's conduct was not the result of negligence of insufficient attention to the business--he was aware of the misrepresentations that resulted in inflated values for property, (Plea Tr. 18.) and he also was aware that MCA's financial statements did not properly reflect the unfunded liabilities in the pools. (<u>Id.</u>) According to the Rule 11 Plea Agreement, Quinlan "knowingly conspired with other employees, officers and directors of MCA to obtain these funds by means of false and fraudulent pretense, representations and promises." (<u>Id.</u>) Third, Defendant's securities laws violations were not an isolated occurrence, but were carried out over an extended period of time throughout MCA's daily operations. Fourth, in his criminal case, Quinlan attempted to withdraw his Rule 11 guilty plea and to maintain his innocence after he entered the plea. In the instant civil action, Defendant continues to assert that he should not be held liable for any and all of the injurious consequences arising from his misrepresentations and other fraudulent conduct. Finally, if the equitable relief is not granted, the Court finds it likely that Defendant would return to the investment industry upon his release from prison, given that the current dispute over the applicability of Section 2462 is brought before the Court precisely because Defendant wants to retain access to the same occupation. All five factors are satisfied, and

the Court concludes that the likelihood of recurrence is present.

In light of the totality of the circumstances, the Court is of the opinion that the risk of recurrence Defendant poses to the investing public more than outweighs the severe collateral consequences arising from the equitable relief. Accordingly, the Court finds that the relief of permanent injunction and officer and director bar in the instant case is of a remedial, rather than punitive, nature. Therefore, the SEC's claims are not subject to the statute of limitations under § 2462.

## V. CONCLUSION

The uncontested evidence presented establishes that the SEC's claim is not time-barred because (1) the relief is of a remedial nature and therefore not subject to Section 2462 limitations period. The Court further finds that the risk Defendant poses to the investing public outweighs the collateral consequences he would otherwise shoulder, and accordingly concludes that the equitable relief of permanent injunction and officer and director bar is warranted. In sum, the Court **GRANTS** the SEC's Motion for Summary Judgment as to defendant Patrick D. Quinlan.

**IT IS SO ORDERED**.


s/Marianne O. Battani
MARIANNE O. BATTANI
UNITED STATES DISTRICT JUDGE


Dated: November 7, 2008

**CERTIFICATE OF SERVICE**

Copies of this Order were mailed and/or e-filed to counsel of record and Patrick Quinlan on this date.

<u>s/Bernadette M. Thebolt</u>
Deputy Clerk